**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jill M Steigleman, | No. CV-19-08060-PCT-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Symetra Life Insurance Company, | |
| Defendant. | |

Plaintiff Jill Steigleman, through the business she owned and operated, purchased long-term disability coverage from Defendant Symetra Life Insurance Company.  In 2017, Steigleman filed a disability claim, stating she was unable to work due to neck pain. Symetra eventually approved the claim and began paying benefits but Steigleman believes the way her claim was handled constituted a breach of contract and the tort of bad faith. After Steigleman filed this suit asserting those state-law claims, Symetra repeatedly admitted Steigleman's state-law claims were proper.   That is, Symetra admitted Steigleman's claims were "not governed by the Employee Retirement Income Security Act of 1974."  (Doc. 8 at 2).  But not long after making those representations, Symetra changed positions and argued Steigleman's claims *are* subject to ERISA.  (Doc. 27).  The Court did not resolve the applicability of ERISA at the outset and the parties proceeded with discovery.

Symetra now seeks summary judgment on two bases.  First, Symetra argues ERISA applies, Steigleman's state-law claims are preempted, and she must pursue the remedies

available under ERISA.  Second, if ERISA does not apply, Symetra believes Steigleman lacks sufficient evidence to support her state-law claims.  Steigleman opposes both arguments but spends most of her time arguing there is sufficient evidence supporting her state-law claims.

The facts viewed in the light most favorable to Steigleman establish ERISA applies to her claims.  Steigleman, perhaps inadvertently, established one or more ERISA-governed plans when her company offered and paid for various forms of insurance to its employees.  Regarding the disability coverage, Steigleman and her employees had coverage from the same company and Steigleman's company paid the disability premiums for Steigleman and the other employees.  Therefore, there was an ERISA-governed plan regarding disability coverage and Symetra's motion for summary judgment will be granted on that basis.

But even if Steigleman's company did not create an ERISA-governed plan regarding disability coverage, there is no genuine dispute of material fact regarding her state-law claims and those claims fail as a matter of law.  The initial denial of Steigleman's claim was due to inaccurate information received from Steigleman's treating physician.  Once that information was corrected, Symetra approved the claim.  In approving the claim, Symetra informed Steigleman that benefits may be limited to twelve months but Symetra never relied on that limitation to deny benefits.  Symetra also suspended benefits when it learned Steigleman started a new job.  It is undisputed, however, that Symetra's information was accurate.  When Steigleman later informed Symetra she had rejected the new position, Symetra continued to pay benefits.  These actions do not meet the objective and subjective requirements for a bad faith claim under Arizona law.

## BACKGROUND

The following is a simplified version of events, presented in the light most favorable to Steigleman.

### A.  Establishment of Business and Purchase of Coverage

In 2008, Steigleman established Steigleman Insurance Agency, LLC, which she

owned and operated.  Under that LLC, Steigleman worked as an agent selling Farm Bureau Financial Services insurance.  (Doc. 140 at 3).  As an agent for Farm Bureau, Steigleman was eligible to join "The Agents Association" ("TAA").  As described by Steigleman, TAA is "a complex entity in that it is a nonprofit organization created solely for the purpose of [Farm Bureau] agents to be able to communicate with [Farm Bureau] management anything they feel could potentially make our policies and/or . . . members . . . better off." (Doc. 131-12 at 53).  In other words, TAA is an organization that individual agents voluntarily join and TAA then advocates on behalf of its members with Farm Bureau management.  (Doc. 131-12 at 110).

While the parties do not make it entirely clear, they appear to agree that at all times relevant to this case, TAA had a contract with an insurance broker known as "mgc group." (Doc. 131-12 at 115).  Pursuant to that contract, mgc "created a world-class benefits packaged designed specifically for [TAA]."  (Doc. 131-12 at 151).  That package allowed agents who were members of TAA to purchase, among other benefits, long-term disability insurance.  (Doc. 131-12 at 151).  The long-term disability insurance was offered pursuant to a group disability policy obtained from Symetra.  Enrollment and premium collection were handled by mgc.

Steigleman first purchased long-term disability coverage with Symetra in June 2009.  (Doc. 131-7 at 2).  At the times relevant to this case, the premiums were paid by Steigleman Insurance Agency.[1]  Under the terms of Steigleman's policy, she would be "disabled" if she could not perform the "material and substantial duties of [her] regular occupation" and her income fell to "less than or equal to 99% of [her] pre-disability earnings."  (Doc. 131-2 at 22).  In the event she was disabled, Steigleman would receive "60% of her basic monthly pre-disability earnings to a maximum monthly benefit of $15,000."  (Doc. 131-9 at 21; Doc. 131-2 at 6).

As of 2016, Steigleman Insurance Agency employed two other individuals.  Those

---

[1] The record discloses that, as of 2016, the premiums were being paid by Steigleman Insurance Agency.  (Doc. 131-8 at 3).  Neither party has provided evidence how the premiums were paid prior to that date.

employees were offered a variety of benefits including health insurance and long-term disability coverage through the same arrangement involving TAA and mgc.  The record does not indicate when the disability coverage was first offered or accepted by the employees.  But as of December 2016, both employees had long-term disability coverage. (Doc. 131-8 at 2, 3).  The employees' coverage was through Symetra but differed slightly from the coverage applicable to Steigleman.  For the employees, they would be "disabled" if they experienced a 20% decrease in pre-disability earnings and, unlike Steigleman's maximum benefit of $15,000 per month, the maximum monthly benefit for the employees was $7,500.  (Doc. 142-9 at 6).  The employees did not pay the premiums themselves. (Doc. 131-12 at 50).  Instead, Steigleman Insurance Agency paid the entire premiums on the employees' behalf.

### B.  Steigleman Applies for Benefits

As of early 2017, Steigleman was experiencing serious neck problems.  On May 30, 2017, Steigleman's orthopedic surgeon, John Ehteshami, operated on her neck.  Steigleman had a follow-up appointment with Dr. Ehteshami on June 14, 2017.  (Doc. 131-6 at 2).  As explained later, there are two versions of Dr. Ehteshami's notes from that follow-up appointment.  The original version of the notes indicated Steigleman had no difficulty swallowing or speaking.  The notes also indicated Steigleman's "[g]rip strength, wrist extensor and flexors, biceps and triceps [were] 5/5."   Under the section labeled "assessment," the notes recounted Steigleman was "doing well" and the "plan" was for her to "continue her activities as she [had] been doing." (Doc. 131-6 at 2).  The original version of the notes did not indicate Steigleman had any restrictions regarding activities or working.

In July 2017, Steigleman applied for long-term disability benefits from Symetra. (Doc. 131-4 at 2).  In the application, Steigleman stated she was "unable to work due to . . . disc stenosis."  Steigleman claimed she had experienced "pain [for] many years," she had "5 herniated discs in neck," and those discs had required surgery.  In one portion of the application Steigleman indicated she was "still attempting [to work] each day as possible"

and she was working part time, but elsewhere in the application she indicated she stopped working May 30, 2017, and had not returned to work.  (Doc. 131-4 at 2, 3).  Steigleman identified her previous salary as $27,430 per month.

The application form included a section completed by one of Steigleman's medical providers, Nurse Practitioner Christina Trujillo.  That section stated Steigleman had "chronic neck pain" and had been "advised . . . to stop working" on July 7, 2017.  (Doc. 131-4 at 6).  The form also stated Steigleman was not able to return to work.

On August 3, 2017, Symetra called Steigleman and left a voicemail asking for a return call.  That same day, Symetra reviewed the information they had received from Steigleman.  (Doc. 131-3 at 19).  After a few missed calls between the parties, Steigleman eventually spoke with a Symetra representative regarding the claim.  (Doc. 131-3 at 19, Doc. 131-11 at 7).  Steigleman explained she had been out of work since May 30, 2017 but she planned to resume physical therapy on September 1, 2017, and she hoped to return to work on January 1, 2018.  Symetra informed Steigleman she would need to submit information regarding her earnings so, if she were found disabled, Symetra could "calculate salary and benefit percentage."  (Doc. 131-3 at 19).

Steigleman did not immediately submit her earnings information.  On August 29, 2017, Steigleman called Symetra and was told she needed to submit her earnings "for May until now."  (Doc. 131-3).  Steigleman was also told of the "90-day elimination period." That period meant Steigleman's long-term disability benefits would only begin "90 days after the date disability begins."  (Doc. 131-2 at 6).  Thus, assuming Steigleman had become disabled as of May 30, 2017, the elimination period would be through August 27, 2017, and benefits would be payable only if she remained disabled after that date.  (Doc. 131-3 at 19).  On September 6, 2017, Symetra faxed a request for medical records to Dr. Ehteshami's office.  (Doc. 131-3 at 18).  Symetra called Dr. Ehteshami's office on September 15, 2017, to ensure the request had been received.  Symetra also received an invoice from Dr. Ehteshami's office for the medical records, which was paid the same day.

Dr. Ehteshami's office provided Symetra the medical records and someone on his

staff also filled out and provided Symetra a "Patient's Restrictions and Capabilities" form. That form, completed on September 21, 2017, stated Steigleman was "doing well" with "strength increasing." (Doc. 131-4 at 14). The form indicated Steigleman could lift up to 40 pounds "frequently" and could carry up to 20 pounds "frequently." (Doc. 131-4 at 13). The form also stated Steigleman could "occasionally" bend/twist, squat, crawl, reach, use a computer keyboard, and use a computer mouse. (Doc. 131-4 at 5). All of these restrictions were labeled with the handwritten comment "per patient ability." Crucially, the form stated "Patient released to return to work with restrictions" as of "8/30/2017." And on the line of the form asking "Can patient work full time?" Dr. Ehteshami's staff checked "Yes." (Doc. 131-4 at 13). Dr. Ehteshami signed the form but, as he explained later at his deposition, he did not fill out the form himself. (Doc. 131-13 at 8). Symetra called Dr. Ehteshami's office on October 2, 2017, seeking clarification of the "per patient ability" statement. Dr. Ehteshami's office stated that refers to "the testing [Dr. Ehteshami] did, [and] is not referring to what [Steigleman] is reporting." (Doc. 131-3 at 18; Doc. 131-11 at 51).

On October 5, 2017, Symetra received notes from Steigleman's physical therapist. Those notes indicated that, as of July 6, 2017, Steigleman had "moderate limitation with walking, severe[] limitation with recreational exercise, mild limitation with sitting." (Doc. 131-3 at 17). The notes from a follow-up appointment on September 12, 2017, recounted Steigleman was "very sore" after the previous week's exercises but she had "increased function." At another appointment on September 14, 2017, Steigleman reported she was "starting to feel stronger." And a week after the September 14 appointment, Steigleman reported she was "feeling progressively better." (Doc. 131-3 at 17).

Nurse Trujilla also provided medical records and filled out a "Patient's Restrictions and Capabilities" form. That form, dated October 18, 2017, differed substantially from what had been reported by Dr. Ehteshami. Nurse Trujilla indicated Steigleman could "never" lift or carry more than ten pounds and she could "never" bend/twist her neck. (Doc. 131-4 at 16). Nurse Trujillo stated these restrictions were through March 2018. Nurse

Trujillo also stated Steigleman was not able to work full time and the date of her return to work was "unknown." In the "comments" section, however, Nurse Trujillo stated "spine surgeon will release for work." (Doc. 131-4 at 16).

On October 13, 2017, Steigleman spoke with Symetra. Part of that call involved Symetra again asking Steigleman for records regarding her earnings. (Doc. 131-11 at 56). But during the call Steigleman informed Symetra that she had seen Dr. Ehteshami on October 11, 2017, and he had told her to "take a couple weeks off" from physical therapy and "he signed something that said don't work 'til January 1st." (Doc. 131-11 at 58). Based on what Steigleman said, Symetra immediately sent a request to Dr. Ehteshami for updated records. Dr. Ehteshami did not provide those records.

On October 26, 2017, Symetra sent a letter to Steigleman denying her claim. (Doc. 131-9 at 12). The letter explained the information received from Dr. Ehteshami was that she had been "released to return to work with restrictions August 30, 2017 and that [she was] able to work full-time." (Doc. 131-9 at 13). Symetra noted Nurse Trujillo offered a different opinion but Nurse Trujillo also indicated she would defer to Dr. Ehteshami regarding Steigleman's ability to return to work. Based in large part on Dr. Ehteshami's opinion that Steigleman could return to work as of August 30, 2017, Symetra denied "any and all liability" on the claim.[2] (Doc. 131-9 at 16).

Shortly after receiving the denial, Steigleman contacted Dr. Ehteshami's office and asked about the accuracy of the June 14 visit notes. (Doc. 131-11 at 178). Steigleman asked for an explanation why Dr. Ehteshami had indicated she could return to work. (Doc. 131-12 at 85). At some point thereafter, Dr. Ehteshami's notes regarding the June 14 visit were changed. Instead of rating her strength as "5/5," the notes were changed to rate her strength at "3/5." The notes were also changed to include "with restrictions" such that they

---

[2] Accepting that Steigleman was disabled as of May 30, 2017, and given the 90-day elimination period, she was eligible for long-term disability benefits as of August 27, 2017. Thus, if Steigleman had not been able to return to work until August 30, 2017, there would be a few days where she was disabled and eligible for benefits. However, Steigleman's earnings from July 30, 2017 through August 27, 2017, were more than 99% of her "pre-disability earnings," meaning she did not meet the income requirements to be found "disabled" and the elimination period was not met as of August 30, 2017. (Doc. 131-9 at 16).

stated Steigleman was to "continue her activities as she has been doing with restrictions." (Doc. 131-11 at 102). During his deposition, Dr. Ehteshami did not know if the June 14 notes had been revised, did not believe his staff members had the ability to do so, and had no explanation how the notes could have been changed. (Doc. 131-13 at 23, 28). It is undisputed, however, that Symetra only had the original version of the June 14 notes at the time of the initial denial.

After receiving revised information from Dr. Ehteshami, Symetra approved Steigleman's claim for long-term disability on February 6, 2018. (Doc. 131-9 at 18). The approval letter explained the policy had a twelve-month limitation for a disability "caused or contributed to by . . . special conditions." (Doc. 131-9 at 19). The policy defined "special conditions" as including "musculoskeletal and connection tissue disorders of the neck and back, including any disease, disorder, injury, sprain, or train of the joints or adjacent soft tissue and muscles of the cervical, thoracic, and lumbosacral regions." (Doc. 131-9 at 19). That limitation was subject to an exception for "[r]adiculopathies,[3] documented by electromyogram and causing measurable neurological weakness." (Doc. 131-9 at 40). Symetra referenced this policy language and stated Steigleman was being approved for only twelve months of benefits at that time. (Doc. 1319- at 20). Symetra stated it would continue to monitor the claim. Finally, the letter asked Steigleman to submit additional income documents so the correct starting date for benefit payments could be calculated. Steigleman and Symetra then exchanged extensive written communications regarding the documentation of Steigleman's income. It is undisputed that Symetra eventually paid all benefits Steigleman believes she was entitled to receive.

In approximately August 2018, Symetra conducted an internal review and concluded the "special conditions" limitation would not apply. (Doc. 141-3 at 4). At that time, Symetra changed its own files to reflect the limitation would not apply. Symetra did

---

[3] The policy does not contain a specialized definition of this term. The standard definition of "radiculopathy" is "[d]ysfunction of one or more spinal nerve roots, characterized by pain and sensory and motor disturbances and often caused by compression." *Kara M. v. Comm'r of Soc. Sec.*, No. C20-5304-BAT, 2020 WL 6144816, at *1 (W.D. Wash. Oct. 20, 2020).

not inform Steigleman of its decision until December 7, 2018.  On that date Symetra wrote to Steigleman and explained it had "received updated medical information, and completed an updated medical review, which confirmed Ms. Steigleman's disability [was] not due to a condition limited" by the policy.  (Doc. 131-9 at 41).  Therefore, the twelve-month limitation did not apply and Steigleman, if she remained disabled, could receive benefits until June 2035.  The December 7 letter closed, however, by noting Symetra had received information that Steigleman had "returned to work [on] November 17, 2018."  (Doc. 131-9 at 41).  Based on Steigleman apparently starting to work again, Symetra suspended further payments until it could gather additional information regarding Steigleman's work.

Upon receiving the December 7 letter, Steigleman sent Symetra an explanation that she was not, in fact, working again.  (Doc. 131-9 at 44).  That explanation, dated December 14, 2018, stated Steigleman had been "appointed briefly to work with" a Farm Bureau agent.  (Doc. 131-9 at 44).  That position had fallen through, however, because it would have required Steigleman spend time at an office "5 hours from [her] house."  (Doc. 131-9 at 44).  On January 7, 2019, Symetra informed Steigleman her benefits would continue to be paid.  (Doc. 131-9 at 69).  The benefits check for December 2018 was delayed because Steigleman had moved and had not updated her mailing address.  (Doc. 131-9 at 72).

Throughout the handling of Steigleman's claim from September 2017 through January 2019, there were internal discussions at Symetra and mgc regarding the payment of Steigleman's benefits.  Those discussions indicate mgc and Symetra were very concerned at the expense of paying Steigleman's claim until June 2035.  Viewed in the light most favorable to Steigleman, the internal discussions reflect an effort to find grounds to deny Steigleman's claim.  For example, in February 2018, an mgc employee sent an email to Symetra stating Steigleman's claim had always been considered "suspect."  (Doc. 142-5 at 25).  The mgc employee stated the claim needed "serious investigating" because Steigleman's "social media pages . . . show a pretty active individual to include the recent Valentine's Day."  (Doc. 142-5 at 25).  A Symetra employee responded and asked for clarification about how mgc wanted Symetra to "approach" Steigleman's claim.  (Doc.

142-5 at 25).   Another email in February 2018 between Symetra employees noted "no payment has been made yet so that's good news!"  (Doc. 142-5 at 17).   According to Steigleman, these communications "reveal the profit-motive behind Symetra's bad faith conduct."  (Doc. 140 at 9).

### C.  Steigleman Files Suit

In February 2019, Steigleman filed the present suit.  The complaint alleged state-law claims for breach of contract and bad faith.  (Doc. 1 at 8).  The complaint also alleged

> Ms. Steigleman's long term disability insurance claim is not governed by or subject to the Employee Retirement Income Security Act of 1974 (ERISA), nor does the Policy assert or advise that disputes or appeals are subject to ERISA.

In answering the complaint, Symetra admitted the long-term disability policy "is not governed by the Employee Retirement Income Security Act of 1974."  (Doc. 8 at 2). Symetra later filed an amended answer containing the same admission.  (Doc. 24 at 2).  A few months later, however, Symetra sought leave to amend its answer for a second time. (Doc. 27).   Symetra explained it had recently "learned information" that indicated Steigleman's coverage was subject to ERISA.  (Doc. 27 at 1).  Steigleman opposed the motion to amend but the Court allowed the amendment.  In doing so, the Court stated the applicability of ERISA would be resolved after full briefing in an appropriate motion. (Doc. 44 at 5).  The parties then proceeded with discovery and, in July 2020, Symetra filed its motion for summary judgment.  (Doc. 131).

### ANALYSIS

Symetra's motion for summary judgment argues ERISA preempts Steigleman's state-law claims and, if ERISA does not apply, Steigleman lacks sufficient evidence supporting her claims.  Viewing the facts in the light most favorable to Steigleman, ERISA preempts Steigleman's claims.  But even if ERISA did not, Steigleman lacks sufficient evidence supporting her state-law claims.

### A.  ERISA Applies

According to Symetra, ERISA preempts Steigelman's claims based on two

arguments.  First, Steigleman Insurance Agency, LLC, "established and sponsored an ERISA-governed welfare benefit plan" when "[i]t purchased disability insurance" for Steigleman *and* her employees.  (Doc. 131 at 9).  Second, TAA was an "employee organization" that "established and sponsored an ERISA welfare benefit plan" when it offered insurance packages to its members.  (Doc. 131 at 9).  The first argument is more straightforward, and dispositive, so the Court need not reach the second argument.[4]

The parties agree that if Steigleman's disability coverage was part of an "employee benefit plan," as that term is defined in ERISA, her state law claims cannot proceed.  *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir. 1998) ("ERISA broadly preempts state law that relates to 'any employee benefit plan' as described in the statute.") (quoting 29 U.S.C. § 1144(a)).  Pursuant to the statutory definition, an "employee benefit plan" is "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance . . . benefits in the event of . . . disability."  29 U.S.C. § 1002(1).  This "fairly tautological definition" provides little assistance in that it defines "employee benefit plan" as including "any plan."  *Bassiri v. Xerox Corp.*, 463 F.3d 927, 933 (9th Cir. 2006); *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir. 1985).

The Ninth Circuit has adopted criteria for a court to assess whether a particular arrangement qualifies as a "plan" under the statutory definition.  *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 546 F.3d 639, 651 (9th Cir. 2008).  Determining whether a particular arrangement qualifies under those criteria "is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person."  *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir. 1988).  But it does not take much for an employer to establish an ERISA plan.  "An

---

[4] When presented with an almost identical set of facts, a district judge in Tucson concluded ERISA did not apply to disability insurance purchased by a different insurance agency. *Adams v. Symetra Life Ins. Co.*, No. CV-18-00378-TUC-JGZ-LAB, 2020 WL 6441034, at *3 (D. Ariz. Nov. 3, 2020).  That conclusion, however, appears to have been premised on a finding that Symetra waived its argument that ERISA applied once the insurance agency at issue extended coverage to the owner of the insurance agency and its employees.  *Id.* There is no argument by Steigleman that Symetra waived the argument here.

employer . . . can establish an ERISA plan rather easily.  Even if an employer does no more than arrange for a 'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees."  *Credit Managers Ass'n of S. California v. Kennesaw Life & Acc. Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987).  Thus, an employer might establish an ERISA-governed plan but fail to comply with ERISA's many requirements.  An employer's non-compliance with ERISA would not, however, exempt the plan from ERISA coverage.  Rather, it would "merely indicate[] a failure . . . to comply with ERISA."  *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir. 1985).

Crucially for present purposes, the regulation implementing the statutory definition of "employee benefit plan" explains the definition does not include "any plan, fund or program . . . under which no employees are participants covered under the plan." 29 C.F.R. § 2510.3-3(b).  And "[n]either an owner of a business nor a partner in a partnership can constitute an 'employee' for purposes of determining the existence of an ERISA plan." *Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 407 (9th Cir. 1995).  Accordingly, if a particular arrangement covers only the owner of a business, that arrangement necessarily is not an "employee benefit plan" covered by ERISA.  *Id.*  If, however, an arrangement satisfies the statutory definition but covers "working owners *and* their nonowner employees," that arrangement "fall[s] entirely within ERISA's compass."  *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 21 (2004).

In the present case, the parties do not argue about the Ninth Circuit criteria for determining if an "employee benefit plan" is at issue.  Instead, the arguments center on the fact that when Steigleman (or Steigleman Insurance Agency) first purchased disability coverage from Symetra, the only individual covered was Steigleman, the owner of the business.[5]  Therefore, the parties seem to agree ERISA did not apply to Steigleman's disability coverage at that time.  "Years later," and prior to the relevant events in this

---

[5] There is no evidence in the record establishing this fact.  However, the parties' arguments assume ERISA did not apply initially and, for purposes of summary judgment, the Court will do the same.

lawsuit, Steigleman Insurance Agency let two of its employees apply for various benefits offered through TAA, including disability coverage from Symetra.  Those employees opted for some of the benefits, including disability coverage.  Steigleman Insurance Agency then paid "the premiums for [those] staff-LTD policies."  (Doc. 140 at 15).  Thus, as of 2016, Steigleman Insurance Agency was paying Symetra for long-term disability insurance covering Steigleman *and* two employees.

Once Steigleman Insurance Agency offered its employees coverage under the Symetra disability policy, and began paying the associated premiums, it would be strange to conclude there was not an ERISA plan, of some type, in the picture.  From the employees' perspective, their employer had created a program, that was maintained and paid for by their employer, for the purpose of providing benefits in the event the employees became disabled.  That tracks, exactly, the statutory definition of "employee benefit plan." 29 U.S.C. § 1002(1).  And the fact that Steigleman Insurance Agency paid the premiums for its employees means it cannot take shelter in the "safe harbor" that exempts "certain group or group-type insurance programs" from being subject to ERISA.  29 C.F.R. § 2510.3-1(j).  *See also Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1153 (9th Cir. 2000) (failure to satisfy one of the regulatory requirements takes arrangement outside of safe harbor).[6]

Steigleman does not squarely attack any aspect of applying the statutory definition of "employee benefit plan" to the disability arrangement at Steigleman Insurance Agency as of 2016.  (Doc. 140 at 15-16).  Instead, she argues "[a] policy subject to ERISA when established may remain so even if it subsequently covers no employees, but non-ERISA policies do not convert to ERISA when employees gain coverage."[7]  (Doc. 140 at 16).

---

[6] The failure to meet the safe harbor does not mean the arrangement automatically qualifies as an ERISA plan.  *See Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1121 (9th Cir. 1998) (noting failure to meet the safe harbor "is not conclusive" evidence of an ERISA plan).  However, "an employer's payment of a portion of the insurance premium is a significant factor for determining the existence of an ERISA plan."  *Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1390 (9th Cir. 1995).

[7] Ninth Circuit authority on the applicability of ERISA at various points in time is very difficult to reconcile.  Part of the confusion stems from the Ninth Circuit using inexact language when describing the continued application of ERISA.  *See Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 875 (9th Cir. 2001) (attempting to clarify "dicta in . . .

Steigleman does not cite any authority reaching this conclusion and it cannot be right.[8] Accepting Steigleman's position would create a large loophole in ERISA's coverage. For example, if a health insurance policy originally covered only the owner of a small company, that policy would, of course, not be subject to ERISA. But if the small company prospered, hired thousands of employees, and extended coverage to those employees under the *same* health insurance policy, it would be quite strange to conclude ERISA did not apply to the employees' coverage.

Accordingly, Steigleman's argument that ERISA will *never* apply to a particular arrangement based on events subsequent to the arrangement's origins is not persuasive. The argument Steigleman likely means to make, but does not do so clearly, is that what occurred with the disability coverage offered by Steigleman Insurance Agency was the creation of two distinct "plans." The first plan, involving disability coverage only for Steigleman, was a non-ERISA plan. The second plan, involving disability coverage for the employees, was an ERISA-governed plan. There is some Ninth Circuit authority generally supportive of not bundling together all "plans" offered by a company and labeling that bundle a single ERISA-governed plan. But that authority does not help Steigleman.

In *LaVenture v. Prudential Ins. Co. of Am.*, 237 F.3d 1042 (9th Cir. 2001), a husband and wife were the sole shareholders of a commercial printing company. The company

---

earlier case law" regarding the applicability of ERISA). The Ninth Circuit has also reasoned that different rules regarding ERISA coverage apply when there is a pension plan, instead of an employee welfare benefit plan, at issue. *See In re Stern*, 345 F.3d 1036, 1041 (9th Cir. 2003) (concluding the different types of plans may be "outcome determinative" for assessing whether ERISA continues to apply).

[8] The Court is aware, however, of at least one case that lends support to Steigleman's position. That case stated "Logically, if an ERISA plan cannot be converted into a non-ERISA plan by the departure of an employee, neither should a non-ERISA plan be convertible into an ERISA plan by the later arrival of employees (especially when those employees participate in a different policy purchased at a different time for a different purpose)." *Stenger v. Provident Life & Acc. Ins. Co.*, 121 F. Supp. 2d 1238, 1248 (E.D. Wis. 2000). This statement is not persuasive. To begin, "logic" does not require any particular outcome of the two different sequences regarding ERISA coverage. There is nothing "illogical" about treating two different sequences differently. More importantly, it is undisputed some ERISA plans *are* converted into non-ERISA plans by the departure of an employee. *See In re Lowenschuss*, 171 F.3d 673, 680 (9th Cir. 1999) (rejecting argument that ERISA plan "could not lose its ERISA status merely by the attrition of all employees); *In re Stern*, 345 F.3d 1036, 1041 (9th Cir. 2003) (holding a plan's status under ERISA must be "made as of the bankruptcy filing date").

- 14 -

"purchased a health insurance policy covering only" the husband and wife.  *Id.* at 1043.
Two years later, the company purchased disability insurance to cover the husband and wife.
One year after that, the company hired its "first full-time employee and provided company
paid health insurance to the new employee." *Id.* at 1044.  The company "did not, however,
offer the new employee disability insurance." *Id.*  The company subsequently hired more
employees, also offering them "health insurance but not disability insurance." *Id.*  Later,
the wife filed a claim for disability benefits.  When the claim was denied, the wife filed
suit, alleging numerous state-law claims.  The issue for the Ninth Circuit was whether
ERISA applied to the disability policy.

The Ninth Circuit began by noting ERISA's definition regarding an "employee
welfare benefit plan" did not reach plans where "no employees are participants." *Id.* at
1045.  Because the parties agreed the disability policy covered only the owners and not any
employee, it was clear "that if the only policy at issue . . . were the disability policy, it
would not be subject to ERISA." *Id.*  But there were other policies potentially involved.
The argument for extending ERISA coverage to the disability policy was "that the
disability insurance policy became an ERISA employee benefit plan when the [owners]
provided health benefits to their employees." *Id.*  In other words, "once the business
offered a welfare benefit plan subject to ERISA all the benefits offered by the business
became subject to ERISA." *Id.*  The Ninth Circuit rejected this attempt to bundle different
arrangements together, explaining "a company may offer more than one benefit plan, one
covering only the owner of the business and the other covering the business's employees,
and maintain those two plans as independent plans under ERISA." *Id.*  The Ninth Circuit
did not explain what was required for two plans to retain their status as "independent
plans." *Id.*  Instead, the court merely noted there was "no evidence to establish that the
disability policy and health plan were intertwined so as to constitute one overall benefit
plan." *Id.*

It appears *LaVenture* is the best available Ninth Circuit authority regarding multiple
benefits arrangements not being bundled together as a single ERISA plan.  Other Courts of

Appeal, however, have also analyzed the issue.  Unfortunately, those cases do not present an entirely coherent picture.  A trio of cases from the Fifth Circuit illustrate the difficulties within a single circuit.

In *Robertson v. Alexander Grant & Co.*, 798 F.2d 868, 871 (5th Cir. 1986), the Fifth Circuit addressed a situation where a partnership had two retirement plans.  The first plan covered only partners while the second plan, with "nearly identical" terms, covered employees of the partnership.  A partner later sued, claiming he was entitled to retirement benefits pursuant to ERISA.  The partnership argued ERISA did not cover retirement plans providing benefits only to partners and, therefore, the partner could not invoke ERISA when seeking benefits.  The partner responded that the two separate retirement plans were "really one plan."  *Id.*  The Fifth Circuit rejected the partner's position, reasoning "the plans, however similar, [were] two separate plans."  *Id.*  Thus, ERISA did not apply to the plan covering only partners.

Years later, the Fifth Circuit distinguished *Robertson* in a case involving disability insurance.  In *House v. American United Life Ins. Co.*, 499 F.3d 443 (5th Cir. 2007), a law firm purchased a "multi-class group insurance policy."  *Id.* at 451.  That policy provided coverage to three classes: non-attorney employees, non-partner attorneys, and partners.  *Id.* at 446.  The policy provided one definition of "total disability" for the non-attorney employees and another definition for the partner and non-partner attorneys.  The partners paid the premiums for their coverage while the law firm paid the premiums for everyone else.  *Id.* at 449.  The disability benefits were the same for everyone covered.  *Id.* at 446.  When a partner became disabled and sued, asserting only state-law claims, the question was whether the partner's disability policy was "a benefit plan regulated by ERISA."  *Id.* at 448.

The Fifth Circuit concluded the "partner-class disability coverage" was subject to ERISA because it "was part of a comprehensive employee welfare benefit plan covering both partners and employees."  *Id.* at 451-52.  The coverage "was bargained and paid for as a package by the firm" with "the only distinctions between classes" being the way "pre-

disability earnings" were calculated for the partners and a "more generic disability description" being applicable to the non-attorney participants." *Id.* at 452.  In the Fifth Circuit's view, it would be inappropriate to split the disability insurance arrangement into ERISA-covered and ERISA-exempt components because doing so would require "some insureds to pursue benefits under state law while requiring others covered by the identical policy to proceed under ERISA."  *Id.*  Thus, the disability coverage for the partner was "part of an ERISA plan" and his state-law claims were preempted.  *Id.* at 452-53.  In addressing why *Robertson* did not dictate a different outcome, the court stated the disability classes were not "separate and distinct plans."  *Id.* at 451.  Instead, the disability coverage for partners and others were "sufficiently related and intertwined as to constitute one overall benefit plan."  *Id.* at 452.

Finally, in *Boos v. AT&T, Inc.*, 643 F.3d 127, 131 (5th Cir. 2011), the Fifth Circuit addressed an attempt to impose ERISA on a unique retirement benefit granted to former employees of a telephone company.  That company had established a practice of offering "discounted telephone services for [its] employees and retirees" who lived in particular regions and "reimbursement in the same amount" for retirees living outside the designated regions.  Some retirees sued, claiming the practice established an ERISA pension plan and the company had "failed to follow ERISA regulations for pension plans."  *Id.* at 128.  Importantly, the plaintiffs conceded that for the retirees living in the designated areas, the discounted telephone service was "not a pension plan" subject to ERISA.  But the plaintiffs argued the reimbursement paid to retirees living outside the designated regions *was* an ERISA pension plan.  In other words, the plaintiffs argued the practice had created two distinct plans: a non-ERISA plan and an ERISA plan.  The Fifth Circuit did not agree.

According to the Fifth Circuit, "[w]hether a benefit plan is a single plan or multiple plans is determined by employer intent."  *Id.* at 132.  In determining "whether an employer intended a benefit program to consist of one or multiple plans," courts consider "whether the plan is located in one or multiple plan documents," whether the plan documents "show an intent to create a single plan or multiple plans," "whether the benefits are separately

funded," "whether the offered benefit is the same," and whether the plans are administered separately.  *Id.*  After considering these factors, the Fifth Circuit concluded the practice regarding discounted telephone service or reimbursement of telephone service was "a single plan," not subject to ERISA.  *Id.*

While the Fifth Circuit was struggling with the application of ERISA to multiple benefits arrangements, the Sixth, Tenth, and Eleventh Circuits were doing the same.  In *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598 (6th Cir. 2007), the question was whether the "different ERISA-regulated health benefit coverage alternatives" offered by two employers should be viewed as separate ERISA plans or all part of the "same ERISA plan."  *Id.* at 602-03.  The distinction was important in terms of whether the plaintiffs could sue particular defendants under ERISA.  The Sixth Circuit concluded there was insufficient evidence that the "plans were intended to operate as separate plans, or operated as such in practice."  *Id.* at 605.  The Sixth Circuit placed special emphasis on the fact that the employers had "registered only *one plan* document with one ERISA identification number" with the Department of Labor.  *Id.* at 606.  Moreover, there was no other evidence of an "intent . . . to establish multiple plans."  *Id.*

In *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1509 (10th Cir. 1996), the dispute involved an employer who provided its employees "health and dental coverage, life insurance and disability benefit insurance."  There were separate "plan documents for each of the four benefit programs."  *Id.*  Because the plaintiffs wished to rely on language in the health care arrangement when interpreting an aspect of the long-term disability arrangement, they argued "that all four of the benefit plan documents really constitute one ERISA plan."  *Id.* at 1511.  The Tenth Circuit rejected that argument, reasoning the employer "intended to create separate plans," each plan had "different ERISA identification numbers," the plans did not "share the same administrator or trust," and "the language of the plans documents" made it "clear" the employer "intended to establish four different plans."  *Id.*

Finally, the Eleventh Circuit addressed the situation of a dentist who purchased

different benefits for himself and his employees.  In *Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102 (11th Cir. 1999), the dentist owned his own dental practice.  In 1981, that "dental practice established a health plan providing health and life insurance coverage . . . for [the dentist] and his employees." *Id.* at 1103.  In 1985, the dental practice had purchased a disability insurance policy covering the dentist but none of his employees.  The Eleventh Circuit concluded the arrangement providing benefits to employees qualified as an "employee welfare benefit plan" under ERISA but the disability coverage did not.  Citing an earlier decision, the court explained "non-ERISA benefits do not fall within ERISA's reach merely because they are included in a multibenefit plan along with ERISA benefits." *Id.* at 1105 (quoting *Kemp v. IBM Corp*, 109 F.3d 708, 713 (11ᵗʰ Cir. 1997)).  Because there was no evidence "showing that the two programs [were] related," the disability arrangement was not subject to ERISA.  *Id.* at 1106.  *See also Caltagirone v. N.Y. Cmty. Bancorp, Inc.*, 257 F. App'x 470, 474 (2d Cir. 2007) (noting plans were separate because they had "separate written plan documents" and filed separate forms with the Department of Labor).[9]

Based on these cases, deciding whether Steigleman Insurance Agency had one ERISA-governed plan covering Steigleman and her employees or one ERISA-governed plan covering employees and one non-ERISA-governed plan covering only Steigleman

---

[9] Other district courts have also addressed this situation.  In *Ober v. Berkshire Life Ins. Co.*, No. 1:06-CV-169, 2008 WL 11342559 (E.D. Tenn. Jan. 18, 2008), a small company purchased a disability insurance policy covering its sole owner and sole employee.  Later, the company hired other employees and offered those employees "health insurance, dental insurance, and a 401(k) retirement savings program." *Id.* at *2.  The employees were not offered disability coverage.  When the owner sought benefits under the disability policy, the court had to decide if ERISA applied.  The court concluded there was "no doubt that the health insurance, dental insurance, and 401(k) program . . . constituted an ERISA employee benefit plan." *Id.* at *5.  But the disability policy was "completely independent and separate" from the employee benefit plan.  Therefore, ERISA did not apply.  *See also Talley v. Kansas City Life Ins. Co.*, No. 1:05-CV-190, 2006 WL 482412, at *4 (E.D. Tenn. Feb. 28, 2006) (deeming disability policy covering owner not subject to ERISA because it was not offered to employees and employees had non-disability benefits "through different insurers").

comes down to a practical assessment of employer intent coupled with an assessment of the extent to which the two disability insurance arrangements were "intertwined." Based on her briefing and the evidence in the record, there is no evidence Steigleman had any particular intent in establishing the various benefits arrangements. That is, Steigleman did not have an intent to create an ERISA-plan covering her employees nor did Steigleman have an intent that her non-ERISA covered benefits remain distinct from those offered to her employees. Rather, it appears Steigleman simply did not consider ERISA at all.

Because there is no evidence of Steigleman's intent, the Court must look to the extent the two disability arrangements were "intertwined." And on that front, the Court has not located any authority where a court examined facts like the present and concluded there were multiple plans at issue. The cases involving multiple plans where courts concluded ERISA did not apply to one plan involved different types of benefits being offered to the owner and employees, often from different insurers. For example, an employer offering health insurance coverage to its employees will not result in ERISA applying to the disability insurance coverage offered only to the owner. *LaVenture v. Prudential Ins. Co. of Am.*, 237 F.3d 1042 (9th Cir. 2001); *Slamen*, 166 F.3d at 1105. But here, the putatively separate plans were for the same type of benefits, through the same insurer, all paid for by Steigleman Insurance Agency. The plans had slight differences, such as the maximum benefit payable to Steigleman versus her employees, but those differences pale in comparison to the difference between for example, health insurance and disability insurance. The closest available authority appears to be *House v. American United Life Ins. Co.*, where the Fifth Circuit concluded various "classes" of disability insurance, from the same insurer, had to be viewed as a single ERISA-governed plan. 499 F.3d 443 (5th Cir. 2007). The same result is merited here. Steigleman Insurance Agency offered a single ERISA-governed plan regarding disability benefits. Therefore, Steigleman's state-law claims are preempted.

The conclusion that ERISA preempts Steigleman's state-law claims requires the Court interpret the currently pending claims "as the correct federal claim[s], or else dismiss

[the claims] with leave to formally replead the claim under federal law." *Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1058 (9th Cir. 2018). Given that no benefits have been denied, it is not clear whether Steigleman has any viable ERISA-based claims. To make things clear, the Court will require repleading. The parties shall confer and file a joint status report indicating a proposed deadline for Steigleman to do so.

### B. Insufficient Evidence of Bad Faith

Symetra also argues that, assuming ERISA does not apply, Steigleman does not have sufficient evidence establishing the tort of bad faith. There is evidence Symetra and its related entities were skeptical of Steigleman's claim and the cost of her claim was viewed negatively. But Symetra's initial decision to deny the claim was based on the opinion of Steigleman's own treating physician. Symetra eventually approved the claim once the treating physician revised his opinion. Symetra's other actions, such as informing Steigleman of a possible limitation or investigating if she had started working again, were objectively reasonable. A viable claim for bad faith under Arizona law requires more than what Steigleman offers.[10]

Under Arizona law, "[a]n insurer acts in bad faith when it unreasonably investigates, evaluates, or processes a claim (an 'objective' test), and either knows it is acting unreasonably or acts with such reckless disregard that such knowledge may be imputed to it (a 'subjective' test)." *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789, 794-95 (Ariz. Ct. App. 2012). An attempt by an insurer "to gain unfair financial advantage of its insured through conduct that invades the insured's right to honest and fair treatment" is enough to support bad faith claim. *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276,

---

[10] Steigleman has a separate claim for breach of contract but the basis of that claim is not clear. It is undisputed that, after some delay, Symetra approved Steigleman's claim and began paying benefits. Symetra has continued paying benefits during this litigation. Thus, there does not appear to be any failure by Symetra that is cognizable under a breach of contract theory. At the very least, Symetra argued Steigleman's breach of contract claim failed "because she is being paid [the] monthly benefits" promised by the contract. (Doc. 131 at 15). Steigleman responded that "the evidence . . . defeats summary judgment on breach of contract" but she did not provide any elaboration pertinent to her contract claim. (Doc. 140 at 9). Instead, Steigleman focused on the evidence regarding her bad faith claim. Thus, assuming ERISA does not apply, Symetra is entitled to summary judgment on the breach of contract claim.

279–80 (2000).   Forcing an "insured to go through needless adversarial hoops" or "delay[ing] claims hoping that the insured will settle for less" will also suffice.  *Id.*  But a bad faith claim must be premised on more than "[m]ere mistake and inadvertence."  *Miel v. State Farm Mut. Auto. Ins. Co.*, 912 P.2d 1333, 1339 (Ariz. Ct. App. 1995).  And when the facts viewed in the light most favorable to the insured establish the insurer had an "objectively reasonable basis" for its actions, summary judgment should be granted.  *Lennar Corp. v. Transamerica Ins. Co.*, 256 P.3d 635, 641 (Ariz. Ct. App. 2011); *Regal Homes, Inc. v. CNA Ins.*, 171 P.3d 610, 622 (Ariz. Ct. App. 2007) (affirming grant of summary judgment on bad faith claim where insurer's decision "though ultimately incorrect, was reasonable").

In opposing summary judgment on her bad faith claim, Steigleman points to actions that can be broadly divided into four categories: 1) events before the initial claim denial in October 2017; 2) the limited approval of her claim in December 2017; 3) the suspension of her benefits in December 2018; and 4) internal communications.  While the entire course of events must be kept in mind when evaluating Symetra's behavior, looking at these categories in detail establish there is no evidence of objectively unreasonable behavior nor is there evidence Symetra subjectively knew it was acting unreasonably or that Symetra was acting with reckless disregard of Steigleman's interests.

### 1.  Initial Denial

It is not entirely clear where Steigleman believes Symetra went wrong in its behavior leading up to the denial of her claim on October 26, 2017.  Steigleman's main contention appears to be that Symetra should have handled the records received from Dr. Ehteshami's office differently.  It is undisputed the records originally received from Dr. Ehteshami's office indicated Steigleman was not disabled.  Normally, an insurer is faulted for *not* deferring to the treating physician.  *Cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (addressing rule of giving "special weight" to treating physician).  Here, however, Steigleman argues Symetra acted in bad faith by deferring to Dr. Ehteshami's statement that she could work full time.  According to Steigleman, accepting

the information from Dr. Ehteshami required "turning a blind eye to the rest of the medical evidence." (Doc. 140 at 9). But it is not clear what constitutes "the rest of the medical evidence" Steigleman has in mind. *See* Fed. R. Civ. P. 56(c) (requiring citation "to particular parts of materials in the record").

The original notes from Steigleman's June 14, 2017, visit with Dr. Ehteshami did not indicate Steigleman had significant limitations or any decrease in strength. The form completed by Dr. Ehteshami's office in September 2017 explicitly stated Steigleman had been released to return to work as of August 30, 2017, three months after her surgery. The information in the notes and form was not patently incorrect. That is, it was certainly possible Steigleman could have recovered to the point of resuming work three months after her surgery. And Symetra even called Dr. Ehteshami's office to clarify the information it received and was told the form represented Dr. Ehteshami's independent evaluation through "testing," instead of merely Steigleman's own view of her limitations.

Beyond the incorrect information from Dr. Ehteshami, at the time it made its initial claim decision Symetra also had the records from Steigleman's physical therapy sessions. Those records indicated Steigleman was improving over the summer of 2017 and do not contain any obvious indication that Steigleman remained incapable of working. The records from Nurse Trujillo did report more restrictions than the other available information. But Nurse Trujillo stated Steigleman's return to work would be handled by Dr. Ehteshami. Given the evidence available to Symetra, it was objectively reasonable to issue the denial on October 26, 2017.

Steigleman attempts to undermine the reasonableness of the October 26 denial by arguing Symetra should have made greater efforts to obtain additional records from Dr. Ehteshami before making its decision. It is undisputed, however, that on October 13, 2017, Symetra requested Dr. Ehteshami's office send updated records. (Doc. 141-6 at 9). As of October 26, Dr. Ehteshami's office had not done so. According to Steigleman, Symetra should have waited longer for the records. Like her complaint that Symetra should have rejected Dr. Ehteshami's opinion, Steigleman's argument that Symetra should have waited

longer is directly contrary to what most insureds argue.  Normally, an insured complains of undue delay in claims handling.  But here Steigleman points to the *lack* of additional delay as evidence of bad faith.

Steigleman does not cite any authority requiring an insurer wait, potentially indefinitely, for a provider to send updated records.  As explained by a Symetra employee during a deposition, the October 26 denial was issued because, as of that date, Steigleman's claim "had been pending for about three months" and Symetra wanted to "get [Steigleman] a decision." (Doc. 141-6 at 12).  When a claim has already been pending for three months, it is not objectively unreasonable for an insurer to request a physician provide updated records, wait two weeks, and when no records are forthcoming, issue a decision on the available evidence.[11]  There is no genuine dispute of material fact that Symetra had an objectively reasonable basis for issuing the initial denial on October 26.

### 2.  Acceptance with Limitation

After the initial denial, Steigleman spoke with Dr. Ehteshami's office.  The record does not disclose what happened but it is undisputed Dr. Ehteshami's office changed the June 14 appointment notes and also provided a revised form regarding Steigleman's restrictions.  Those revisions indicated Steigleman could not work.  After Symetra received this additional information in late December 2017, it conducted a review of the claim. (Doc. 131-3 at 12).  Symetra spoke with Dr. Ehteshami's office on January 26, 2018, regarding the change in his opinions.   (Doc. 131-3 at 11).  Symetra then approved the claim on January 31, 2018.  (Doc. 131-3 at 9).

In approving the claim, Symetra informed Steigleman that, pursuant to her policy, she would receive no more than twelve months of benefits if her disability was "caused or contributed to by . . . special conditions."  (Doc. 131-9 at 19).  Believing Steigleman's

---

[11] Even if Symetra had waited to receive Dr. Ehteshami's updated records, it is undisputed those updated records would have contained very little information.  The additional records covered Steigleman's follow-up appointment with Dr. Ehteshami on October 11, 2017.  The notes from that appointment state, under the section for "assessment," "Please see previous note."  And under "plan," the notes state Steigleman "will continue her activities with restrictions" and "will see [Dr. Ehteshami] back subsequently."  (Doc. 131-6 at 39).  Steigleman does not explain why these statements, if Symetra had obtained them, would have resulted in a different initial decision.

condition might implicate the "special conditions," Symetra informed Steigleman she was approved for 12 months of benefits but Symetra would "continue to monitor her claim." (Doc. 131-9 at 20).  On December 7, 2018, Symetra sent a letter to Steigleman's counsel stating it had received "updated medical information, and completed an updated medical review" and concluded "Steigleman's disability is not due to a condition limited by the Special Condition" previously cited.  (Doc. 131-9 at 41).

Steigleman argues the letter mentioning the possibility her benefits would be limited to twelve months is evidence of bad faith.  According to Steigleman, the letter is evidence Symetra has an inappropriate policy of waiting to conduct a full evaluation of the policy's "special conditions" limitation until "near the end" of the twelve months.  (Doc. 140 at 11).  During a deposition, a Symetra employee explained the decision regarding the limitation's applicability is made towards the end of the twelve-month period so that Symetra has the most up-to-date information at the time the limitation may be invoked.  When asked why the limitation's applicability is not decided at the same time the claim is approved, the employee stated it would not be "accurate" to do so "because at that point, how could we know what's affecting her at the 12-month mark if we are so far ahead of it."  (Doc. 141-6 at 77).  In any event, despite complaining of Symetra's policy to delay a decision regarding the limitation's applicability, the record establishes Symetra conducted an internal review in approximately August 2018 and concluded the limitation would not apply.  (Doc. 141-3 at 4).  Steigleman was informed of that decision a few months later and it is undisputed the limitation was never used to prevent payment of benefits.

As with her other arguments, it is hard to understand why, exactly, Steigleman believes Symetra's actions constituted bad faith.  The approval letter noted that, given the disabling condition, Steigleman's claim potentially implicated the twelve-month limitation in her policy.  Apparently Steigleman believes that by informing her that her benefits *might* be limited, Symetra acted inappropriately.  It is difficult to see how informing an insured of a possible limitation could constitute bad faith.  It is undisputed Symetra later reviewed the claim, determined the limitation did not apply, and informed Steigleman of that fact.

Thus, if Symetra had acted exactly the same, except it never informed Steigleman of the possible twelve-month limitation, Steigleman would have no problem with what occurred. It was not objectively unreasonable for Symetra merely to disclose to Steigleman her claim might be subject to a limitation.

### 3. Suspension of Claim

Steigleman argues Symetra's December 7, 2018, letter supports her bad faith claim because it stated, in relevant part, "[w]e have recently been informed that Ms. Steigleman returned to work November 17, 2018 with Farm Bureau." (Doc. 131-9 at 41). Based on that statement, Steigleman's payments were "suspended" until she provided additional information regarding her new employment. According to Steigleman, this was a "disingenuous reason[]" and the true reason for the suspension was "to facilitate policy renewal negotiations." (Doc. 140). Again, Steigleman's argument is puzzling in light of the undisputed facts.

It is undisputed Steigleman *had* accepted a "Sales Associate" position with a Farm Bureau agent shortly before the December 7, 2018 letter. (Doc. 131-9 at 44). Steigleman explained for that position she had been labeled a "Sales Associate" but her "actual role" was going to be as a "business coach" to an agent. (Doc. 131-9 at 44). That position had fallen through because Steigleman was not willing to spend time in the agent's office, located "more than 5 hours" from Steigleman's house. (Doc. 131-9 at 44). Symetra continued to pay benefits after receiving this information. Given Steigleman's admission that she had accepted a new position, it was not objectively unreasonable for Symetra to suspend her benefits pending the receipt of additional information regarding her new position.

### 4. Internal Communications

Finally, Steigleman cites to internal communications allegedly establishing that Symetra's actions were due to financial self-interest. The internal communications do not change any aspect of the actual handling of Steigleman's claims. The communications reflect skepticism that Steigleman's claim was valid and reflect concern over the expected

- 26 -

cost of paying Steigleman's benefits.  But Steigleman cannot point to any behavior by Symetra that was objectively unreasonable given the undisputed evidence.  Regardless of what was being said internally regarding the validity of Steigleman's claim, the initial claim denial was based on the opinion of Steigleman's treating physician that she was not disabled.   Later, Symetra conducted an investigation of Steigleman's activities but continued to pay benefits.  And Symetra's brief suspension of benefits was based on accurate information that Steigleman had accepted a new job.

An insurer's internal discussions regarding a claim may, of course, support a bad faith claim.  But internal discussions that do not lead to objectively unreasonable behavior by the insurer are not sufficient evidence of bad faith.   If Symetra's internal communications reflected skepticism towards her claim and there was no objective basis for such skepticism, the situation would be quite different.  But here, Symetra's actual behavior was objectively reasonable, regardless of the internal discussions.  Neither the internal discussions nor the other alleged instances of misconduct establish Symetra acted in bad faith.  Therefore, if ERISA did not preempt Steigleman's claims, they would fail as a matter of law.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 131) is **GRANTED**.

**IT IS FURTHER ORDERED** no later than **March 10, 2021**, the parties shall file a joint statement indicating whether Plaintiff wishes to replead ERISA-based claims.  If she does, the parties must provide proposed deadlines for the remainder of this case.

Dated this 1st day of March, 2021.

Honorable Roslyn O. Silver
Senior United States District Judge