**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jill M Steigleman,<br><br>    Plaintiffs,<br><br>v.<br><br>Symetra Life Insurance Company,<br><br>    Defendant. | No. CV-19-08060-PCT-ROS<br><br>**ORDER** |

The Ninth Circuit concluded there was a dispute of fact whether Plaintiff Jill Steigleman's "long-term disability policy was part of an 'employee welfare benefit plan' under the Employee Retirement Income Security Act (ERISA)." *Steigleman v. Symetra Life Ins. Co.*, 2022 WL 912255, at *1 (9th Cir. 2022). After a bench trial, almost all the facts are undisputed. To the extent there are factual disputes, the Court makes the factual findings set forth below. Based on those factual findings, the Court concludes Steigleman's disability coverage was part of an employee welfare benefit plan established or maintained by an employer.

**BACKGROUND**[1]

Steigleman was an insurance agent who sold insurance products issued by Farm Bureau Financial Services. From 2008 to 2018, Steigleman owned and operated the Steigleman Insurance Agency ("Agency"). During that period, the Agency always had one or two employees but, at times, as many as four. (Doc. 216 at 89-91). When she

---

[1] The parties stipulated to much of the relevant background. (Doc. 193). Those stipulations are accepted and, to the extent relevant, incorporated into this Order.

established the Agency, and throughout its existence, Steigleman was a member of The Agents Association ("TAA"). TAA is a nonprofit organization formed by Farm Bureau agents to represent their common interests to the management of Farm Bureau. (Doc. 216 at 124).

At all times relevant to this suit a company named "mgc Group" was TAA's insurance broker. In that role, mgc Group offered what both parties identify as "benefits" to TAA members and their staff. (Doc. 222 at 5) (TAA offered "group benefits); (Doc. 223 at 4) (TAA offered "TAA Plan benefits"). Those benefits consisted of various types of insurance coverages, such as long-term disability, short-term disability, and life insurance. The coverages mgc Group offered through TAA were from a variety of insurance companies, including Defendant Symetra Life Insurance Company that offered long-term disability coverage. Some of the coverages were only available to TAA members (*i.e.*, Steigleman) while others were available to TAA members as well as their staff and families (*i.e.*, the Agency's staff and their families). (Doc. 223 at 4). The TAA coverages had eligibility requirements, such as employment by a TAA member for a minimum amount of time or working a minimum number of hours per week. Steigleman did not have any direct control over TAA's eligibility requirements, and she did not impose unique eligibility requirements on the Agency's staff.

Based on Steigleman's membership in TAA, the Agency's employees were eligible to enroll in TAA's coverages. (Doc. 216 at 95). The Agency used some of those TAA coverages in offering its employees a "benefits package."[2] Steigleman believed offering a benefits package was important both for recruiting and retaining qualified employees. (Doc. 216 at 100). Steigleman viewed offering the Agency's employees the coverages handled by TAA "as a way of having less administrative duties so that [she] could just run

---

[2] During her deposition, Steigleman described her Agency as offering its employees a "benefits package." (Doc. 216 at 98). At trial, Steigleman testified her previous use of the term "benefits package" was based on TAA's description of the various coverages. (Doc. 216 at 99). It appeared Steigleman believed it was detrimental to her position to refer to the TAA coverages as the Agency's "benefits package," but Steigleman's testimony established she viewed the Agency as providing a group of benefits to its employees. Thus, Steigleman's attempt at trial to avoid using the term "benefits package" was not convincing.

[her] insurance agency." (Doc. 216 at 104). Steigleman agreed she was "essentially" delegating administration of the employees' coverages to TAA. (Doc. 216 at 105).

Steigleman's testimony regarding the handling of the Agency's benefits package was contradictory and, at times, not credible. Steigleman tried to claim she "wasn't involved at all" in assessing the quality of the coverages offered by TAA. (Doc. 216 at 100). But TAA offered a type of medical coverage that Steigleman concluded was "not good insurance." (Doc. 216 at 96). Thus, Steigleman opted to obtain medical coverage for the Agency's employees not through TAA but through Blue Cross Blue Shield. (Doc. 216 at 95). As for the other coverages available through TAA, such as long-term disability, Steigleman agreed she could have obtained those coverages through alternatives other than TAA, but she chose not to do so. (Doc. 216 at 100-101). Based on her in-court testimony, including demeanor, the Court concludes it is more likely than not that Steigleman—a long-time professional in the insurance industry—assessed the quality of all the coverages offered by TAA and concluded the non-medical coverages offered by TAA were of sufficient quality for the Agency to offer to purchase for its employees.

At trial Steigleman attempted to distance the Agency from any involvement in the TAA benefits by testifying she would inform employees "that anything they received when they got their e-mail [from TAA offering coverages], I would pay for the policy." (Doc. 216 at 102). Based on her opting to obtain medical coverage through Blue Cross Blue Shield, but also informing the employees they could purchase any of the other coverages offered, the offer by Steigleman and the Agency to pay for the TAA coverages was effectively an endorsement of the non-medical coverages offered by TAA.

As of 2009, two employees of the Agency were enrolled in short-term disability, dental, and vision coverage through TAA. (Doc. 193 at 5-6). As of 2017, two different Agency employees were enrolled in short-term disability, long-term disability, dental, and vision coverage through TAA. In 2017, TAA also offered critical illness/cancer, accident, and telehealth coverage that the Agency's employees could have selected. (Doc. 193 at 6). As of 2017 Steigleman was enrolled in long-term disability, excess disability, long term

care, critical illness/cancer, dental, vision, and telehealth coverage through TAA. (Doc. 193 at 6). Steigleman has offered no plausible explanation why her employees in 2009 and 2017 selected almost exactly the same list of coverages while declining others.[3]

Both in 2009 and in 2017, coverages beyond those selected by the Agency's employees were available. According to Steigleman, the Agency would have paid 100% of the premiums on the employees' behalf. It is implausible the employees would have gone through the TAA application on their own and selected almost identical sets of coverages, despite knowing they could enroll in all of the available coverages and that the Agency would pay all the premiums. It is more probable than not Steigleman conveyed to her employees which coverages would be paid for by the Agency and which would not. The employees then selected the coverages that would not cost them anything and declined those coverages where they would have to pay. This conclusion is supported by Steigleman's trial testimony regarding which premiums the Agency would pay.

When asked why the Agency's employees did not select all the available coverages if the Agency had agreed to pay all the premiums, Steigleman stated her staff were making relatively low salaries and likely did not have "the money to go buy everyone in their family long-term care [insurance]." (Doc. 216 at 106). This statement required clarification because, up to that point in the case, Steigleman had always maintained the selection of coverages was left solely to the Agency's employees and the Agency had promised to pay *all* premiums, regardless of which coverages were selected. Steigleman's trial testimony, however, established she set limits on the coverages the Agency would pay for, and which coverages would be the responsibility of the employees.

If the Agency's employees selected any of the TAA-offered coverages for their family members, the employees were required to pay the premiums for those coverages. (Doc. 216 at 106). When asked if this meant she set "some parameters for the coverage" available to the Agency's employees, Steigleman stated "Yes. And that is – I think that's pretty standard in most companies." (Doc. 216 at 106). Thus, the Court finds the Agency

---

[3] Long-term disability was not offered to staff in 2009. (Doc. 216 at 101).

- 4 -

informed its employees the Agency would pay only for certain types of coverage and even for those coverages, the Agency would only pay for the employees and not for their families.[4]

There were a variety of ways to pay the premiums owed to TAA. Steigleman opted to have the premiums for the Agency's employees paid out of her commission check. (Doc. 216 at 107). The premiums were reflected on commission statements received only by Steigleman. (Doc. 216 at 164, 123). Because of the limitations on which coverages could be selected and the Agency's determination to only pay for coverage of the employees and not their families, Steigleman must have monitored the premium statements. In other words, to enforce the undisputed limitations regarding which coverages could be selected and which portion of the premiums the Agency would pay, Steigleman had an ongoing obligation to monitor her commission statements. The Agency did not recoup from its employees the cost of any of the coverages obtained through TAA. (Doc. 216 at 114). The Agency concluded the employees' premiums were business expenses, and it identified those payments on its tax return under the line for "Employee Benefit Programs." (Doc. 216 at 120).

From the perspective of the Agency's employees, the coverages provided by TAA were benefits of their employment. (Doc. 216 at 201). If an employee left her employment at the Agency, the coverages provided by TAA ended.[5] (Doc. 216 at 202). If an Agency employee went to work for another business that also offered TAA coverages, the former employee would be eligible to purchase the TAA coverages through the new employer.

---

[4] This factual finding requires crediting the testimony of Steigleman on this point over that of her employee, Michelle Morin. According to Morin, "[t]here were no limitations" on which of the TAA coverages employees could enroll in and the Agency would pay the entire premium. (Doc. 216 at 222). Morin's testimony was not credible on this point because she could not remember many of the details regarding the selection of coverages. In fact, Morin could not remember if she was even aware that some of the other coverages, such as critical illness or accident insurance, were available. Morin's lack of memory regarding the available coverages provides additional support for Steigleman being involved in steering the employees towards specific coverages.

[5] There was no evidence the TAA coverages were similar to coverage an employee may elect to retain after leaving employment. *See, e.g.*, *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 874 (9th Cir. 2001) (discussing individual insurance coverage converted from an "ERISA-regulated group insurance plan").

- 5 -

(Doc. 216 at 209). But regardless of that possibility, the TAA coverages were viewed by Agency employees as employment benefits tied to their employment relationship at the Agency.

From 2012 forward, the long-term disability coverage through TAA was provided under a policy issued by Defendant Symetra Life Insurance Company. (Doc. 216 at 123). As of 2017, the policy covered both Steigleman and the Agency's employees. (Doc. 216 at 123-24).

## ANALYSIS

The sole dispute is whether the Agency established or maintained an "employee welfare benefit plan" as that term is defined under ERISA. "[T]here is no authoritative checklist that can be consulted to determine whether an employer's actions establish an ERISA plan." *Demars v. CIGNA Corp.*, 173 F.3d 443, 446 (1st Cir. 1999). Rather, "the existence of an ERISA plan is a question of fact, to be answered in the light of *all the surrounding circumstances* from the point of view of a reasonable person." *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir. 1998) (emphasis in original).[6] The burden is on Symetra to prove by a preponderance of evidence the existence of an ERISA plan. *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988); (Doc. 216 at 87-88) (parties agreeing to burden and standard of proof).

ERISA defines an "employee welfare benefit plan" to include "any plan, fund, or

---

[6] In *Zavora*, the Ninth Circuit noted the employer did not pay the insurance premiums, but the employer was identified as the "plan administrator" in a plan document. The Ninth Circuit reasoned that being identified as the "plan administrator" was not enough, on its own, to conclude the employer had established or maintained an ERISA-governed plan. 145 F.3d at 1121. There was "a triable issue of fact concerning the existence of an ERISA plan" and the Ninth Circuit remanded for further proceedings. *Id.* at 1122. On remand, the district court held a trial where evidence emerged the employer had paid either 50% or 100% of the employees' premiums. Based on those payments, together with the employer being identified as the "plan administrator," the district court concluded the employer had established or maintained an ERISA-governed plan. Doc. 87 in CV-95-5982 (C.D. Cal. January 13, 1999). This history shows that a general remand, without explicit directions, does not require a district court confine itself to the exact arguments or issues identified by the Ninth Circuit. Thus, Steigleman's argument that the Court can look only to the "eligibility" issue identified by the Ninth Circuit is incorrect. As already explained to Steigleman, the "rule of mandate" in this case does not prohibit the Court from taking into account all of the evidence admitted at trial to resolve whether the Agency established or maintained an employee welfare benefit plan. (Doc. 192 at 8).

program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). This "ultimately circular" definition does not provide much guidance. *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000). But in 1987, the Supreme Court stressed ERISA recognizes the difference between "employee benefits" and "employee benefit *plans*." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7 (1987) (emphasis in original). Thus, for example, paying "a one-time severance payment to employees in the event of a plant closing" may be an employee benefit, but such payments will not necessarily establish an "employee welfare benefit plan" as contemplated by ERISA. *Id.* at 3, 12.

Building on the Supreme Court's reasoning, the Ninth Circuit has held determining whether benefits are being provided pursuant to an "employee welfare benefit plan" comes down to the "relatively simple test . . . does the benefit package implicate an ongoing administrative scheme?" *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994). *See also Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (noting ERISA's definition of plan should be viewed "as referring to a scheme decided upon in advance"). The "ongoing administrative scheme" this test has in mind might involve a "responsibility to pay benefits on a regular basis" or "periodic demands on [an employer's] assets that create a need for financial coordination and control." *Fort Halifax*, 482 U.S. at 12. In addition, an "ongoing administrative scheme" often requires an employer exercise "more than a modicum of discretion" in operating the scheme. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 650 (9th Cir. 2008). In fact, "discretionary decision-making . . . is the hallmark of an ERISA plan." *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1322 (9th Cir. 1992). Thus, an employer that was "simply required to make a single arithmetical calculation to determine the amount of [] severance benefits" had not established an ERISA-governed plan. *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997). But severance benefits triggered only under circumstances requiring

a "case-by-case, discretionary application" of requirements, had established an ERISA-governed plan. *Bogue*, 976 F.2d at 1323.

Here, the Agency had an ongoing administrative scheme regarding employee benefits that required the exercise of discretionary decision-making. Steigleman decided the Agency needed to offer a benefits package to recruit and retain staff. To that end, the Agency established or maintained a scheme involving the selection of certain coverages from TAA. The Agency exercised discretion in determining which of the TAA coverages were of sufficient quality to endorse to the Agency employees. The medical coverage, for example, was rejected and the Agency obtained alternative medical coverage.[7] Other than medical coverage, the Agency decided to limit its employees to those coverages offered by TAA. That is, employees could either select the TAA coverages or nothing. Next, the Agency selected which coverages offered by TAA would be paid for by the Agency and which the employees would have to pay on their own. For example, Steigleman selected "telehealth" coverage for herself, but her employees did not. Because the cost to the employees of such coverage would have been zero, Steigleman must have either informed the employees they could not select that coverage or that the Agency would not pay for that coverage. The Agency also exercised discretion in refusing to pay premiums if an employee selected any of the available coverages for a family member. Finally, and of significance, while not a discretionary activity, Steigleman had an ongoing obligation to review her commission statements to determine which coverages the employees had selected and, if necessary, inform the employee the Agency would not pay for the selected coverages.

These facts establish the Agency was not involved in the simple purchase of insurance on behalf of its employees. Instead, the Agency had an ongoing administrative scheme that promised specific benefits to employees and required ongoing monitoring by Steigleman. The extent of the Agency's involvement in its employees' benefits also raised

---

[7] The Court need not resolve whether the medical coverage should be deemed part of the same "plan" as the benefits provided by TAA and paid for by the Agency. The evidence regarding medical coverage merely establishes the Agency (through Steigleman) was active in determining which of the TAA benefits to offer its employees.

- 8 -

the possibility of abuse, providing an additional reason to conclude ERISA applies. *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 649 (9th Cir. 2008) (noting ERISA intended to protect "employees against the abuse and mismanagement of funds").

One of the core goals of ERISA is "to protect the interests of employees in . . . welfare plans." *Henkin v. Northrop Corp.*, 921 F.2d 864, 867 (9th Cir. 1990). Here, Steigleman and the Agency promised to pay the employees' premiums for certain coverages. The premiums were paid out of Steigleman's commission checks, that were never viewed by the employees. Thus, the employees did not have access to the most relevant information for determining whether the premiums were being remitted in a timely manner. Had the Agency failed to pay the premiums, the employees could have found themselves without insurance coverage they had been led to believe they had selected. Allowing employers to offer benefits subject to employer abuse such as was possible here would be contrary to ERISA's goal of protecting employees.

An ongoing administrative scheme that included many discretionary decisions and created a strong potential for abuse means the Agency established or maintained an employee welfare benefit plan. *Cf. Charles Schwab & Co. v. Debickero*, 593 F.3d 916, 919 (9th Cir. 2010) (concluding ERISA did not apply to situation with "no employer oversight, no ongoing employer commitment, nor any potential for employer abuse"). This conclusion is bolstered by looking to what is known as the "safe harbor regulation." That regulation "creates for certain employer practices a 'safe harbor' from ERISA coverage." *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1120 (9th Cir. 1998).

As noted by the Ninth Circuit in the earlier appeal, the Agency's "employees gained access to group-type disability insurance coverage through" TAA. (Doc. 168-1 ta 2). The safe harbor regulation is meant to identify situations where the offering of such group-type coverage will not create an ERISA-governed plan. The regulation states "a group or group-type insurance program offered by an insurer to employees or members of an employee organization" will not be deemed an ERISA plan if:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j). Based on this regulation, the Ninth Circuit has concluded "[a]n employer . . . can establish an ERISA plan rather easily. Even if an employer does no more than arrange for a 'group-type insurance program,' it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees."[8] *Credit Managers Ass'n of S. California v. Kennesaw Life & Acc. Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987).

There is no dispute the second and fourth requirements of the safe harbor were met here. However, there also is no dispute the Agency failed the first requirement of the safe harbor.[9] The Agency paid 100% of its employees' premiums for certain TAA coverages. Under Ninth Circuit law, "an employer's payment of a portion of the insurance premium [is] a significant factor for determining the existence of an ERISA plan." *Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1390 (9th Cir. 1995). The Ninth Circuit concluded in this case that

---

[8] Contrary to Symetra's argument, failing any of the four requirements of the safe harbor regulation does not, necessarily, establish that a group-type insurance program is an ERISA plan. (Doc. 222 at 8) (arguing employer payment of premiums "*will*" constitute a plan"). "[T]he fact that [a] plan is not excluded from ERISA coverage by this regulation does not compel the conclusion that the plan is an ERISA plan." *Howard Jarvis Taxpayers Ass'n v. California Secure Choice Ret. Sav. Program*, 997 F.3d 848, 858 (9th Cir. 2021).

[9] The Ninth Circuit's memorandum disposition stated the Agency's "employees gained access to group-type disability insurance coverage through Steigleman's membership in [TAA], and [the Agency] paid the employees' premiums. While these factors are evidence that Steigleman may have "established or maintained" an ERISA plan, they are not sufficient." (Doc. 168-1 at 2).

payment of those premiums was insufficient to establish the existence of an ERISA plan. But based on the Court's factual findings, payment of the premiums is not the only way the Agency failed to meet the safe harbor.

The third safe harbor requirement mandates an employer not endorse the group insurance program. This is meant to ensure "employer neutrality" in the sense that a reasonable employee would not believe the program was "part of a benefit arrangement established or maintained" by the employer. *Johnson v. Watts Regul. Co.*, 63 F.3d 1129, 1134 (1st Cir. 1995). The First Circuit has offered the clearest test regarding employer endorsement:

> [A]n employer will be said to have endorsed a program within the purview of the . . . safe harbor regulation if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

*Johnson*, 63 F.3d at 1135. The Court's findings of fact establish the Agency's actions would have led every reasonable employee to view the TAA coverages as "part and parcel of the [Agency's] own benefit package." *Id.*

Of particular significance, Steigleman herself believed the coverages available through TAA and offered to the Agency's employees were employment benefits as shown by Steigleman viewing those coverages as benefits necessary to recruit and retain employees. Steigleman noted the provision of benefits was not required and that other businesses chose not to provide benefits to their employees. Thus, the TAA coverages were not viewed as generally available benefits but as benefits *provided by the Agency*.

Additional evidence of the link between the TAA coverages and the Agency, Steigleman informed the Agency's employees they could select specific coverages from TAA—but only specific coverages—and the Agency would pay all the premiums. Employees could not select benefits from any other provider and receive reimbursement from the Agency.

Finally, a former employee of the agency testified she viewed the TAA coverages as a benefit of her employment at the Agency.

> **Question**: And so you considered the disability insurance, the dental insurance, and the vision insurance a benefit of your employment?
>
> **Former employee**: Yes.
>
> **Question**: Employment benefits, correct?
>
> **Former employee**: Yes.

(Doc. 216 at 201). That testimony is credible. In fact, it is hard to imagine an Agency employee could have viewed the TAA coverages as not being "endorsed" by the Agency. Given the extent of the Agency's involvement in the provision of the benefits, including assessments that the coverages were of sufficient quality and limiting the selection to the coverages offered by TAA, the Agency's actions failed the "no endorsement" requirement of the safe harbor regulation. *See McCann v. Unum Provident*, 907 F.3d 130, 144 (3d Cir. 2018) (noting "endorsement may take many forms").

The Agency set out to establish a "benefits package" for its employees and, in doing so, it created or maintained an employee welfare benefit plan. It may be true Steigleman and the Agency did not intend to establish an ERISA-governed plan. But that does not establish no such plan was created. An employer may inadvertently create an ERISA-governed plan. *See, e.g.*, *Deboard v. Sunshine Min. & Ref. Co.*, 208 F.3d 1228, 1238 (10th Cir. 2000) (employer inadvertently created new ERISA welfare plan). And the "determination of whether ERISA governs the [Agency's plan] does not turn on whether [the Agency] intended the plan to be governed by ERISA, but rather on whether [the Agency] intended to establish or maintain a plan to provide benefits to its employees as part of the employment relationship." *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263–64 (11th Cir. 2004). The Court concludes the Agency intended to provide such benefits.

Of course, the Agency did not comply with the administrative and reporting requirements imposed by ERISA. But again, that does not establish no plan existed.

"ERISA operates to protect an employee's interest in the welfare benefit program regardless of whether the employer complies with the administrative and reporting requirements detailed under ERISA." *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1352 (9th Cir. 1984). *See also Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 724 (9th Cir. 2021) (noting possibility of "de facto plan" when no written plan document exists); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 241 (5th Cir. 1990) ("A formal document designated as 'the Plan' is not required to establish that an ERISA plan exists; otherwise, employers could avoid federal regulation merely by failing to memorialize their employee benefit programs in a separate document so designated.").

Steigleman likely had no idea ERISA might apply to the Agency's benefits package, including the long-term disability coverage implicated in this case. But employers offering benefits similar to those provided by TAA "often hope, and typically believe, their plans are not subject to ERISA." 27 No. 1 ERISA Litig. Rep. NL 1. But avoiding ERISA is "tougher to do than many employers think." *Id.* Here, the Court's factual findings establish ERISA applies. Because Steigleman has previously stated she does not wish to pursue any ERISA-based claims, judgment will be entered in favor of Defendant. (Doc. 156).

Accordingly,

**IT IS ORDERED** the Clerk of Court shall enter judgment in favor of Defendant and close this case.

Dated this 9th day of November, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge

- 13 -